SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Joao C. Torres (A-15-22) (086812)**

**Argued February 28, 2023 -- Decided May 4, 2023**

**SABATINO, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, the Court considers whether the seizure of defendant Joao Torres's sweatshirt was justified under the search-incident-to-arrest exception to the warrant requirement in the circumstances presented.

Dispatched to a residence where an axe murder had taken place, Detective Marchak learned that the victim and his stepson, defendant, were the only two people believed to have been in the house the previous night. In the bedroom, the mattress was soaked in blood and there was a significant amount of blood on the wall and ceiling. Within a few hours, officers located defendant, placed him under arrest on an outstanding warrant, and, at 3:55 p.m., placed him in a squad car to be transported to the police station. At the station, detectives interviewed defendant until he invoked his right to counsel. Defendant made incriminating admissions during the interview that provided probable cause to arrest him for murder.

Detective Marchak observed during the interview that defendant "had something on his hands," and that he was "picking at his hands" and "rubbing his fingers." After the interview halted, Detective Marchak consulted other officers "about the preservation of biological evidence." Detective Marchak documented these observations and his concerns about the risks of dissipation within a written report, which specifically reflected that the detective had observed "possibly biological evidence located on Mr. Torres's sweatshirt" and stated that an assistant prosecutor advised him "to seize Mr. Torres's clothing and conduct swabs of his hands in anticipation of approval of a court authorized search warrant for same."

Sergeant James Napp began processing defendant at 6:42 p.m. He photographed defendant from multiple angles; collected his sweatshirt; took more photographs; had defendant remove all but his underwear; took more photographs; swabbed and inspected defendant's fingernails, ears, and beard; and then had him remove his underwear and put on a plastic suit. Once defendant had changed, he was informed he was being charged with "hindering and resisting" at that point.

1

Officers and the assistant prosecutor eventually reached the emergent duty Superior Court judge at 8:03 p.m. The warrant to take swabs from defendant and to seize his clothing was ultimately granted and signed by the judge at 8:30 p.m. The laboratory analysis of defendant's sweatshirt identified traces of the victim's blood. Defendant was charged in a twenty-count indictment with murder, disturbing human remains, and several other offenses.

Defendant moved to suppress the warrantless seizure of his clothing. After a hearing, the judge denied the motion. Defendant entered a guilty plea. He then appealed, arguing that "the trial court erred in denying the motion to suppress the evidence seized as a result of the warrantless strip search." The Appellate Division held that the search was not a strip search but remanded "for more explicit findings of fact and conclusions of law" to justify the warrantless seizure.

On remand, the trial court issued an amplified written opinion holding that the seizure of defendant's clothing was valid as a search incident to arrest under the totality of the circumstances. The Appellate Division affirmed. The Court granted defendant's petition for certification. 252 N.J. 156 (2022).

**HELD:** The Court endorses and applies the two-factor test of State v. Lentz, 463 N.J. Super. 54, 70 (App. Div. 2020), authorizing delayed warrantless searches of a person incident to that person's arrest so long as both (1) the delay itself and (2) the scope of the search were objectively reasonable. The totality of circumstances here establishes such reasonableness, particularly given the officers' observation and video footage showing that defendant appeared to be removing some substance from his fingers and rubbing his clothing while he was being interviewed, as well as the risk that biological evidence would dissipate during the delay while the warrant application was processed.

1. The Court reviews the Strip Search Act and the Attorney General's Guidelines related to that Act. The statute and the Guidelines do not cover the removal and seizure of defendant's sweatshirt for two reasons. First, defendant's zippered sweatshirt, like a coat or a belt, is an article of "outer clothing" expressly excluded from the scope of the statute. N.J.S.A. 2A:161A-3. The fact that the police continued to remove other articles of clothing after obtaining defendant's sweatshirt is irrelevant to the suppression of the sweatshirt as an item of evidence. The Court's analysis must consider each portion of a search on its own terms. Second, the restrictions of the statute apply only to someone "detained or arrested for commission of an offense other than a crime." N.J.S.A. 2A:161A-1 (emphasis added). Although initially arrested on an outstanding traffic warrant, defendant was plainly being detained for murder by the time his clothing was seized. (pp. 20-23)

2

2.  It is well established that a Fourth Amendment exception authorizes the warrantless search of persons incident to their lawful arrest, justified by the need (1) to remove any weapons that the arrested person might possess and seek to use in order to resist arrest or effect an escape; and (2) to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.  In United States v. Edwards, the Supreme Court held that once an "accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other."  415 U.S. 800, 807 (1974) (emphasis added).  Recently, in Lentz, the Appellate Division applied the Edwards rationale, holding that a delayed search incident to a valid arrest will be constitutional so long as "the delay itself and the scope of the search are objectively reasonable."  463 N.J. Super. at 71-72, 76.  The Court reviews Lentz in detail and notes the caveat in that decision -- that the court's holding did not "untether the search incident to arrest exception to the warrant requirement from its justification nor give police free reign to conduct warrantless searches without probable cause at any point after a lawful arrest."  Id. at 79.  Subject to that important caveat, the Court concurs that Lentz's two-part standard of reasonableness for delayed searches incident to an arrest prescribes a proper constitutional balance, and the Court endorses the sound principles set forth in that opinion.  (pp. 24-32)

3.  The Court reviews case law recognizing the risk of dissipation of biological evidence.  Applying Lentz factor one, the delay in performing the search of defendant's body and clothes was reasonable.  There was an ongoing risk that defendant could have dissipated the evidence, either in the interview room or during a washroom break.  The officers had a legitimate concern that it might take considerable time to obtain an after-hours warrant.  The delay was not unreasonable and indeed far shorter than the ten-hour delay upheld in Edwards.  Applying Lentz factor two, the scope of the search, which involved the swabbing of defendant's hands and the removal of his sweatshirt, was reasonable.  The sweatshirt was specifically observed to possibly have biological material on it, and the warrant gave the police the express authority to take the next steps and have the sweatshirt tested. In the totality of circumstances presented, the seizure of defendant's sweatshirt was justified under the incident-to-arrest exception to the warrant requirement and involved no unreasonable delay or excessive scope.  (pp. 32-36)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, and WAINER APTER join in JUDGE SABATINO's opinion. JUSTICE FASCIALE did not participate.**

3

SUPREME COURT OF NEW JERSEY

A-15 September Term 2022

086812

---

State of New Jersey,

Plaintiff-Respondent,

v.

Joao C. Torres,

Defendant-Appellant.

---

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| February 28, 2023 | May 4, 2023 |

---

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Steven A. Yomtov, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

1

Oleg Nekritin submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (Law Offices of Robert J. De Groot and the Ziegler Law Group, attorneys; Oleg Nekritin and Jason LeBoeuf, on the brief).

JUDGE SABATINO (temporarily assigned) delivered the opinion of the Court.

While investigating an axe murder, police officers apprehended defendant and confiscated his clothing, including a sweatshirt, at the police station. The confiscation began about three hours after defendant was taken into custody, following an interview during which he made incriminating statements connecting him to the homicide. During the interview, the officers noticed defendant picking at his fingers and rubbing his clothing. The lead detective also observed what his report described as possible biological evidence visible on defendant's sweatshirt.

That evening, the State presented an after-hours application for a search warrant to an emergent duty judge. The police seized defendant's sweatshirt and other garments before the judge approved the warrant, out of concern that dried blood or other biological evidence might dissipate.

Laboratory testing thereafter confirmed that the sweatshirt contained incriminating traces of the victim's blood. Defendant moved to suppress the sweatshirt evidence, arguing its warrantless confiscation was unconstitutional.

2

For the reasons that follow, we uphold the trial court and the Appellate Division decisions, which concluded that the officers' seizure of the sweatshirt was justified under the search-incident-to-arrest exception to the warrant requirement in the circumstances presented. In particular, we endorse and apply the two-factor test of State v. Lentz, 463 N.J. Super. 54, 70 (App. Div. 2020), authorizing delayed warrantless searches of a person incident to that person's arrest so long as both (1) the delay itself and (2) the scope of the search were objectively reasonable.

As we explain in this opinion, the totality of circumstances here establishes such reasonableness, particularly given the officers' observation and video footage showing that defendant appeared to be removing some substance from his fingers and rubbing his clothing while he was being interviewed, as well as the risk that biological evidence would dissipate during the delay while the warrant application was processed.

Our analysis is consistent with the United States Supreme Court's decision in United States v. Edwards, 415 U.S. 800 (1974), in which the Supreme Court held that a search of a defendant's person ten hours after his arrest, in the circumstances presented there, was constitutional under the Fourth Amendment's incident-to-arrest exception. We further conclude the seizure of the sweatshirt was permissible under Article I, Paragraph 7 of the

3

New Jersey Constitution. Because the incident-to-arrest exception suffices to justify the seizure, we do not reach the State's alternative contention that the seizure was valid under a theory of inevitable discovery.

We reject defendant's separate claim that the seizure was invalidated by the Strip Search Act, N.J.S.A. 2A:161A-1 to -10, and the Attorney General's associated Guidelines regulating strip searches.

We consequently affirm the denial of defendant's suppression motion and his resultant conviction of murder and other crimes.

I.

A.

The facts pertinent to our suppression analysis are largely undisputed. They are also consistent with the video recordings of defendant's interrogation and the seizure of his garments at the police station, recordings that were moved into evidence and considered by the suppression judge.[1]

In the early afternoon of January 4, 2017, Detective Craig Marchak of the Middlesex County Prosecutor's Office was dispatched to a residence in Monroe Township. The detective was told that a 9-1-1 caller had reported a large amount of blood in a bedroom.

---

[1] We have reviewed the video evidence, as did the Appellate Division, as part of the record on appeal.

Upon arriving and conferring with other officers at the scene, Detective Marchak learned that the victim, Christopher Ernst, Sr., and his stepson, defendant Joao Torres, were the only two people believed to have been in the house the previous night. The officers had located Ernst's dead body wrapped in a blanket, with a plastic bag taped over the head, in a room off the garage. Ernst's vehicle was missing, as was defendant. In the bedroom, the mattress was soaked in blood and there was a significant amount of blood on the wall and ceiling. The officers found no indications of forced entry at the home and learned that defendant did not regularly use Ernst's vehicle.

Within a few hours, officers located defendant and the missing vehicle in a heavily wooded area. Upon encountering the officers, defendant fled into the woods. Officers caught defendant and placed him under arrest, having been advised by dispatch that there was an outstanding warrant for his arrest. Although the prosecutor's office had not yet decided whether defendant was to be arrested in connection with Ernst's killing, he was a suspect by that point. At 3:55 p.m., defendant was placed in a squad car to be transported to the police station.

The officers brought defendant to the station house for an interview. The interview, which was conducted jointly by Detectives Marchak and Joseph Silvestri and was video recorded, began at 4:29 p.m.

5

After some cordial banter, Detective Marchak delivered proper <u>Miranda</u>[2] warnings. Defendant asked: "what did I do?" Marchak responded that defendant was not yet charged with anything and that the officers simply wanted to ask some questions. Defendant asked why he had been arrested, and the officers repeated that they just wanted to have a conversation. After confirming that he could invoke his rights at any time, defendant signed the <u>Miranda</u> card.

In the interview that followed, the detectives told defendant that they had responded to a 9-1-1 call concerning "a lot of blood found in a bedroom" in his residence and that they had found a dead body on the property. Defendant stated that he is "always the []scape goat in the family so go ahead," and said, "I'm getting blamed for hurting my step-dad." He claimed that Ernst gave him permission to use the truck the previous night and that he left at some point before midnight, drove around for some time, and slept in the truck. He confirmed that only he and Ernst had been in the home the previous night.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Defendant did not appeal the trial court's ruling that the police did not violate the <u>Miranda</u> doctrine in the course of questioning him.

Detective Marchak told defendant: "You're leaving out a whole big part about what happened in the house that night." The detective added, "We know what happened . . . . We found everything," and "this is the time where you need to sit, sit there and say hey this is why."

At that point, defendant accused the detectives of "trying to pin" the killing on him and invoked his right to counsel. Detective Marchak, who had momentarily stepped out, returned to confirm that defendant had invoked his right to a lawyer. He instructed defendant to "sit tight." That marked the conclusion of the interview, at 5:08 p.m. Defendant indisputably was not free to leave the police department.

Notably, with respect to the issues before us, Detective Marchak had observed during the interview that defendant "had something on his hands," and that he was "picking at his hands" and "rubbing his fingers."[3] Defendant also "put his hands into his pockets,"[4] and Marchak "could see movement within that." After the interview halted, Detective Marchak consulted other officers "about the preservation of biological evidence." Marchak was

---

[3] Defendant can be seen at multiple points in the video footage fidgeting with and picking at his hands and fingernails.

[4] The video shows the pockets were of the sweatshirt and not his shirt or pants pockets.

concerned about "how delicate and fragile" such evidence could be and about "the enormous amount of blood" at the scene.

Detective Marchak documented these observations and his concerns about the risks of dissipation within his written report, admitted into evidence[5] as an exhibit at the suppression hearing. Most pertinent here, the report specifically reflected that the detective had observed "possibly biological evidence located on Mr. Torres's sweatshirt":

> It was observed during the course of the interview that Mr. Torres was <u>attempting to wipe and scrape particles off his hands and from his fingernails which I believed to be an attempt to destruct possible evidence. Furthermore, I observed what appeared to be possibly biological evidence located on Mr. Torres's sweatshirt.</u> Due to this I placed a telephone call to Assistant Prosecutor Scott LaMountain and informed him of the circumstances. <u>I was then advised to seize Mr. Torres's clothing and conduct swabs of his hands in anticipation of approval of a court authorized search warrant</u> for same.
>
> [(emphases added).]

Detective Marchak confirmed these facts in his testimony at the suppression hearing, although he was not asked about the possible "biological evidence" that he had noticed on defendant's sweatshirt. The detective

---

[5] Trial courts are permitted to rely on such hearsay reports at pretrial suppression hearings to determine the admissibility of proofs. <u>See</u> N.J.R.E. 104(a)(1); <u>State v. Bacome</u>, 440 N.J. Super. 228, 239 n.7 (App. Div. 2015), <u>rev'd on other grounds</u>, 228 N.J. 94 (2017).

8

reiterated at the hearing, as he had stated in the report, his concern that "evidence would be . . . on someone's hands or -- or clothing."

Detective Marchak testified about the process that followed:

> DETECTIVE MARCHAK: I let Sergeant [Scott] Crocco [(Marchak's direct supervisor)] know what I observed, and Sergeant Crocco and Sergeant [James] Napp [(supervisor of the Crime Scene Unit)], who we then indicated that to Assistant Prosecutor Scott LaMountain to a -- we wanted to get a search warrant to take his clothes and to swab his hands because of what I was seeing there. And we -- we articulated that to [LaMountain], and in the process of that we were -- we were going to be getting a warrant.
>
> PROSECUTOR: Did you wait for the search warrant to actually be granted before you started processing him?
>
> DETECTIVE MARCHAK: No.
>
> PROSECUTOR: Why not?
>
> DETECTIVE MARCHAK: Because of Sergeant Napp's expertise in -- in the field of forensics with evidence collection. He stated that if [defendant] would ask to go to the bathroom, if he would start rubbing -- I mean, we didn't know how much, if any evidence, was there, but we knew he was rubbing his hands, and we knew with the enormous amount of blood that it -- it possibly would be located on his hands, and even the smallest of speck would be so easily destroyed.

The detective then described the steps that would need to be taken to obtain a search warrant after regular business hours:

9

DETECTIVE MARCHAK: So I would notify . . . Sergeant Crocco . . . that we would need to speak and, you know, explain my probable cause to Assistant Prosecutor Scott LaMountain, who's our section chief of -- of the Major Crimes Unit.[6] . . . I would then have to go from A to Z of everything to him involving the case of what we've learned throughout it from Monroe [Police Department]'s first interaction with the case to then when I came into the case . . . . He would then say, okay, yeah, I feel that we need to start applying for a search warrant here. He would then try to call the sheriff's department, who would provide him an on-call judge. The on-call judge would then have to be contacted. That on-call judge would then have to call Scott LaMountain back. Scott LaMountain would then have to, you know, call us back and say, all right, I got in touch with the judge. . . . LaMountain would then have to call back to the judge and say the detective is ready, and then we'd get on a three-way call at that point.

In light of the anticipated time that it would take to obtain a warrant, the police decided to begin "processing" defendant and collect his clothing before a warrant application was approved. The processing, conducted by Sergeant Napp, took place in an interview room from 6:42 p.m. to 7:02 p.m. and was video recorded.

---

[6] As noted by defense counsel at the suppression hearing, the record does not reveal the time at which Detective Marchak called Assistant Prosecutor LaMountain for his help in initiating the warrant application process. Specifically, it is unclear whether that phone call was made before the seizure of defendant's clothing commenced, during the seizure, or afterwards. Regardless, it is undisputed that the officers did not wait for the warrant to be issued before confiscating defendant's sweatshirt and his other clothes.

Sergeant Napp began by photographing defendant from multiple angles. Next, defendant's zippered sweatshirt was collected, which defendant unzipped and removed without resistance or comment. After his sweatshirt was collected, Napp took more photographs of his hands, face, and head.

Napp directed defendant to remove the rest of his clothing, and defendant was photographed wearing only his boxer shorts for about one minute. His hands, fingernails, ears, and beard were swabbed and inspected while he was still in his boxer shorts.

Defendant was then instructed to remove his boxer shorts and change into a one-piece, footed plastic suit. Defendant removed his boxer shorts while holding the plastic suit in front of his genitals to block them from view. Napp did not photograph defendant while he changed.

Once defendant had changed into the suit, Detective Marchak informed him that he was being charged with "hindering and resisting," and that those were his charges "at this point." Defendant left the room with the detectives at 7:02 p.m.

At some point following defendant's interview, the State pursued the process of obtaining a search warrant. According to Detective Marchak's written investigative report, "the Court Smart Telephone recording system was not working properly and was unable to record the [warrant] application."

11

Instead, "[the] application was made from the Monroe Township Police Headquarters on a recorded line which was preserved and retained as evidence. Due to the circumstances an additional recording of the application was generated utilizing a handheld audio recorder."[7]

Officers and the assistant prosecutor eventually reached the emergent duty Superior Court judge at 8:03 p.m., and they conferred with the judge for about half an hour. The warrant to take swabs from defendant and to seize his clothing was ultimately granted and signed by the judge at 8:30 p.m.

Criminal complaints for murder, obstructing the administration of law, and resisting arrest by flight were approved by Assistant Prosecutor LaMountain and transmitted to a municipal judge at about 12:30 a.m. The complaints were signed by hand due to problems with a new computer system. Defendant was transported to the Middlesex County Adult Corrections Center sometime thereafter.

Further evidence developed during the investigation showed that defendant had used several of Ernst's credit cards between 1:49 a.m. and 3:33 a.m. in the early morning of January 4 at a fast-food restaurant and at various convenience stores.

---

[7] The record supplied on appeal does not show whether these problems with the recording system that night delayed the search warrant application process and, if so, for how long.

12

The hand swabs taken from defendant were not tested, for reasons unclear from the record. But the laboratory analysis of defendant's sweatshirt identified traces of Ernst's blood.

In March 2017, defendant was charged in a twenty-count indictment with first-degree murder, second-degree disturbing human remains, third-degree fraudulent use of credit cards, and several other offenses.

B.

Defendant moved to suppress the warrantless seizure of his clothing.[8] The trial court conducted a one-day suppression hearing in April 2018, at which Detective Marchak was the sole witness. At the hearing, defendant argued that the warrantless search and seizure of his clothing required suppression because it was neither contemporaneous with the arrest nor credibly done to preserve evidence. He did not assert at the hearing that he had been subjected to an unlawful strip search, although his letter brief alluded, without any statutory or other legal citation, to a "strip search." Meanwhile, the State argued the search was constitutionally permissible based on the incident-to-arrest exception. The State also asserted, as an alternative justification, the doctrine of inevitable discovery, contending that the officers

---

[8] On appeal, defendant clarifies that he seeks suppression of "all evidence found as a result of" the search, which presumably includes the lab report.

would have been able to obtain defendant's garments as part of routine procedures at the jail.

The judge denied the suppression motion. In his brief oral opinion, the judge found that the police did not act unreasonably under the circumstances in having defendant remove and exchange his clothing before the issuance of a warrant. Among other things, the judge noted the risks to the State of the loss of biological evidence on defendant's hands and clothing as time passed, and the need "to secure [that] evidence under these exigent circumstances."

Following plea negotiations, defendant pled guilty in May 2018 to murder, disturbing human remains, and two counts of fraudulent use of a credit card. During the plea colloquy, defendant admitted that he deliberately killed Ernst by striking him several times with an axe and then concealed the body. In July 2018, defendant was sentenced in accordance with the plea agreement on the murder count to thirty years in prison, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The court imposed concurrent sentences on the other offenses, also consistent with the plea agreement.

As permitted under Rule 3:5-7(d), defendant appealed following his conviction, arguing that "the trial court erred in denying the motion to suppress the evidence seized as a result of the warrantless strip search," and asking that the matter be remanded so he could withdraw his guilty plea. Unlike at the

14

suppression hearing, that appeal characterized the seizure of defendant's clothes as a "strip search." Defendant argued that strip searches incident to arrest are disallowed and that the doctrine of inevitable discovery cannot be applied to strip searches.

In an unpublished decision, the Appellate Division "recognize[d] procedural defects in defendant's present strip-search argument." The appellate court noted that the term "strip search" was mentioned only once in the trial court briefing, in the facts section of defendant's letter brief to the trial court on the motion to suppress. The appeals court also noted that the only mention of a strip search at the suppression hearing was by the assistant prosecutor, who remarked that she could not "stand by the proposition that [law enforcement] would have been permitted to do a strip search" when defendant was arrested for the non-criminal traffic offense. However, the Appellate Division did not rule that defendant had waived the strip search argument, and instead addressed the question on the merits.

In holding the search was not a strip search, the Appellate Division observed that N.J.S.A. 2A:161A-3(a) defines a strip search as "the removal or rearrangement of clothing for the purpose of visual inspection of the person's undergarments, buttocks, anus, genitals or breasts." (emphases added). The court acknowledged that "photographing defendant in his underwear could

15

very well be considered a visual inspection of his underwear," but "no evidence resulted from those photographs" that could have been suppressed. The Appellate Division noted that "the only evidence found was trace amounts of the victim's blood on defendant's sweatshirt" and that the seizure of that outer garment "did not involve an inspection of undergarments or defendant's private areas."

Even though defendant's first appeal focused entirely on the strip search argument, the Appellate Division nonetheless chose to remand the case to the trial court "for more explicit findings of fact and conclusions of law" to justify "the warrantless seizure, whether it be [the] incident to arrest or inevitable discovery [doctrines]."

## C.

On remand, the trial court issued an amplified written opinion holding that the seizure of defendant's clothing was valid as a search incident to arrest under the totality of the circumstances. The trial court highlighted that defendant was found with the victim's vehicle; defendant had fled from police; and defendant was plausibly trying to destroy evidence during the interview by scratching his hands. The court concluded that "considering the information officers were already [privy] to regarding the victim's death, a real-time decision had to be made" and that it was "objectively reasonable" to seize

16

defendant's clothing. The trial court did not analyze the State's alternative argument of inevitable discovery. Defendant again appealed, under the original appellate docket number. He argued that the "police were not permitted to seize and search [his] clothes without a warrant hours after his arrest."

The Appellate Division affirmed the trial court in an unpublished decision. The Appellate Division underscored that defendant was "clearly a suspect" in the murder and that he "appeared to be destroying the evidence on his hands as the interview progressed." In light of those and other facts, the Appellate Division concluded:

> Given the totality of the circumstances -- namely the blood discovered at the crime scene and that the body was moved from one part of the residence to another; defendant's attempt to flee police; and his comments and conduct at the interview -- it was not unreasonable for police to conclude his clothing also contained evidence of the crime.

The Appellate Division upheld the judge's finding that the delay of less than two hours from the end of the interview to the seizure of defendant's clothing was reasonable. It added that "the search was not unduly intrusive because, as we previously ruled [in the first appeal], defendant was ordered to remove his clothing to retain the evidence on the garments rather than to visually inspect his underwear or body."

17

In support of this finding of reasonableness, the Appellate Division cited Edwards, 415 U.S. at 806-08, in which the United States Supreme Court held the seizure and subsequent search of a defendant's incriminating clothing about ten hours after his arrest was a valid search incident to arrest. The Appellate Division also cited to its opinions in State v. Oyenusi, 387 N.J. Super. 146, 156 (App. Div. 2006), and Lentz, 463 N.J. Super. at 68, both of which invoked Edwards in holding that a search incident to arrest does not always have to be conducted contemporaneously with the arrest. The Appellate Division therefore held the trial court "properly concluded the search incident to arrest was constitutional and did not err in denying the suppression motion."

Defendant petitioned this Court for certification, which was granted. 252 N.J. 156 (2022). Although defendant's letter petition referred only to the Appellate Division's second opinion and his brief filed in the second appeal, his supplemental brief filed in this Court also included his strip search claims that had been rejected in the first appeal. We granted permission to participate as amici curiae to the American Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

II.

Defendant contends the Appellate Division erred in concluding that the strip search statute and the Attorney General's related Guidelines did not require suppression of his sweatshirt. Defendant does not argue that if all the officers had done here was seize his sweatshirt, the statute and Guidelines would have been violated. However, he maintains that the officers' continuation of the process, having defendant remove the rest of his clothes and photographing him, was one continuous illegal strip search.

As for the incident-to-arrest exception, defendant maintains that the police acted unreasonably in seizing his clothing more than two hours after arresting him instead of waiting for a judge to issue a search warrant. He contends there was no reasonable danger that biological evidence would be destroyed while he was at the police station being monitored by multiple officers. He suggests that the fingernail-picking and clothes-rubbing in the interview room could simply have been nervous fidgeting. He also argues that the inevitable discovery doctrine is inapplicable.

The State asks that we affirm the Appellate Division in all respects. As part of its contention, the State argues that defendant procedurally waived his strip search argument. The State also requests that the seizure of the

19

sweatshirt be upheld under the incident-to-arrest doctrine, the exigent-circumstances exception, or the doctrine of inevitable discovery.

The ACLU addresses only the alleged procedural waiver of the strip search issue, whereas the ACDL focuses on the search-incident-to-arrest issue. Both amici urge that we adopt a more restrictive approach to the police's authority to seize an arrestee's garments and that we reverse the rulings in this case.

## III.

We first address -- and readily dispense with -- defendant's reliance upon the strip search statute and the Attorney General's Guidelines. To provide guidance to the bench, bar, and law enforcement agencies, we choose to entertain the merits of those arguments rather than rest our disposition on any alleged procedural shortcomings.

Enacted in 1985, the Strip Search Act limits the use of strip searches in particular circumstances. See State v. Evans, 235 N.J. 125, 133-35 (2018). The statute defines a strip search as "the removal or rearrangement of clothing for the purpose of visual inspection of the person's undergarments, buttocks, anus, genitals or breasts" but excludes from that definition "the removal of articles of outer-clothing such as coats, ties, belts or shoelaces." N.J.S.A.

20

2A:161A-3(a). Strip searches of persons "detained or arrested for commission

of an offense other than a crime"[9] are barred under the Act unless:

> a. The search is authorized by a warrant or consent;
>
> b. The search is based on probable cause that a weapon, controlled dangerous substance, . . . or evidence of a crime will be found and a recognized exception to the warrant requirement exists; or
>
> c. The person is lawfully confined in a municipal detention facility or an adult county correctional facility and the search is based on a reasonable suspicion that a weapon, controlled dangerous substance, . . . or contraband, as defined by the Department of Corrections, will be found, and the search is authorized pursuant to regulations promulgated by the Commissioner of the Department of Corrections.
>
> [N.J.S.A. 2A:161A-1.]

The statute further provides that "[t]he Attorney General shall issue . . .

guidelines governing the performance of strip and body cavity searches as he

deems necessary to promote compliance with this act." N.J.S.A. 2A:161A-

8(b). The Attorney General has since adopted such guidelines. See Attorney

General's Strip Search and Body Cavity Search Requirements and Procedures

for Police Officers (June 1995) (the Guidelines).[10]

---

[9] We discuss this statute's applicability only to one detained or arrested for "an offense other than a crime" below.

[10] Available at https://www.state.nj.us/lps/dcj/agguide/3strpsch.pdf.

21

As the Appellate Division correctly found, the statute and the Guidelines do not cover the police's removal and seizure of defendant's sweatshirt for two reasons. First, defendant's zippered sweatshirt, like a coat or a belt, is an article of "outer clothing" expressly excluded from the scope of the statute. N.J.S.A. 2A:161A-3. The removal of defendant's sweatshirt revealed neither defendant's nude body nor any undergarments.

The fact that the police continued to remove other articles of clothing after obtaining defendant's sweatshirt is irrelevant to the suppression of the sweatshirt as an item of evidence. The Court's analysis must consider each portion of a search on its own terms. See, e.g., State v. Patino, 83 N.J. 1, 8-9, 12-15 (1980) (ruling that the constitutionality of a vehicle search should be analyzed with specific reference to the zone being searched). We need not address whether the subsequent removal of other garments and photographing of defendant complied with the statute. Here, the State was not seeking to admit any other evidence it obtained after collecting the sweatshirt; the sole focus of the suppression motion concerned the sweatshirt and the biological material it contained. The statute does not affect the motion.

Second, as noted above, the restrictions of the statute apply only to someone "detained or arrested for commission of an offense other than a crime." N.J.S.A. 2A:161A-1 (emphasis added); see also State v. Brown, 456

22

N.J. Super. 352, 360-64 (App. Div. 2018) (nullifying the Guidelines insofar as they regulated searches related to crimes).

The parties acknowledge that defendant was initially arrested on an outstanding traffic warrant. However, by the time his clothing was seized, defendant was plainly being detained for Ernst's murder. By the end of defendant's interview or shortly thereafter, the police knew a host of facts indicative of a crime: defendant had been in the home with the victim the previous night; there were no signs of forced entry at the home; defendant was found using the victim's vehicle even though he did not have a valid license and the victim "never let him use that vehicle"; defendant fled from police upon encountering them; and defendant repeatedly picked at his fingers and hands during the interview in a manner that could be consistent with removing or destroying evidence from what officers knew was an extremely bloody homicide. Probable cause to arrest defendant for murder clearly existed. When the removal of defendant's garments began, the Strip Search Act did not apply, because defendant was being detained for a crime.

Therefore, the Appellate Division's first opinion correctly rejected defendant's arguments under the statute and the associated Guidelines. Defendant relies on no precedent from the United States Supreme Court that compels a different conclusion on constitutional grounds.

23

IV.

A.

We turn to the search-incident-to-arrest exception.

Both "the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution . . . protect citizens against unreasonable police searches and seizures by requiring warrants issued on probable cause 'unless [the search] falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Dangerfield, 171 N.J. 446, 455 (2002) (alteration in original) (quoting State v. Maryland, 167 N.J. 471, 482 (2001)); accord State v. Legette, 227 N.J. 460, 471-72 (2017).

It is well established that such a Fourth Amendment exception authorizes the warrantless search of persons incident to their lawful arrest. See Chimel v. California, 395 U.S. 752, 762-63 (1969); Dangerfield, 171 N.J. at 461. Even in the absence of an arrest warrant, the search of the individual by law enforcement officers is lawful if they had probable cause to arrest the person being searched. State v. Mark, 46 N.J. 262, 271-72 (1966); State v. Doyle, 42 N.J. 334, 342-44 (1964). Probable cause exists when the totality of the facts and circumstances presented to an arresting officer would support a person "of reasonable caution in the belief that an offense has been or is being committed." State v. Sims, 75 N.J. 337, 354 (1978) (quoting Draper v. United

24

States, 358 U.S. 307, 313 (1959)); see also State v. Johnson, 171 N.J. 192, 214 (2002) (reiterating the oft-stated principle equating probable cause with "a 'well-grounded suspicion'" of criminal activity (quoting State v. Sullivan, 169 N.J. 204, 211 (2001))); State v. Gibson, 218 N.J. 277, 292 (2014) (same).

Two justifications underlie the search-incident-to-arrest exception:  the need (1) "to remove any weapons that the [arrested person] might [possess and] seek to use in order to resist arrest or effect [an] escape"; and (2) "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."  Chimel, 395 U.S. at 763; accord United States v. Robinson, 414 U.S. 218, 226 (1973); Dangerfield, 171 N.J. at 461 (citing these dual justifications).

As this Court noted in Dangerfield, the search-incident-to-arrest exception "is not limitless in terms of purpose or scope."  171 N.J. at 461.  In construing those limits, we recognize that defendant has raised arguments under both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. However, our case law has "[g]enerally . . . not afforded greater protection regarding the scope of a search incident to a lawful arrest under our State Constitution than that provided in Chimel's interpretation of the Fourth Amendment."  Id. at 461-62. We adhere to that general practice in this case, resting our analysis on Fourth

25

Amendment principles without adopting a more expansive approach under our State Constitution in this setting.

The present case does not involve a contemporaneous search of an arrestee, but rather a delayed one. In its seminal decision in Edwards, the United States Supreme Court addressed the constitutionality under the Fourth Amendment of such a delayed search. 415 U.S. at 801.

The defendant in Edwards had been arrested shortly after 11:00 p.m. for attempting to break into a post office and was placed in a jail cell. Ibid. Investigators learned that the intruder had left paint chips at the scene while trying to pry open a wooden window, which made it probable that Edwards's clothing also contained such paint chips. Ibid. The following morning, about ten hours after his arrest, officers at the jail removed Edwards's clothing and provided him with substitute garb they had purchased that morning. Id. at 801-02. Tests revealed that paint chips on Edwards's clothing matched those left at the crime scene, thus evidencing his guilt. Id. at 802. Edwards moved to suppress the forensic paint-chip evidence, contending the warrantless seizure of his clothing violated the Fourth Amendment. Ibid.

The Supreme Court rejected that argument. Id. at 804-05. It noted that no substitute clothes for Edwards were available at the jail overnight, and it would have been unreasonable for the police to have taken his garments and

26

left him naked in his cell until the morning.  Id. at 805.  The Court observed that the clothing seizure was "a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention."  Id. at 805.

The Court in Edwards summarized these guiding principles concerning the delayed searches of arrestees as follows:

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

> [Id. at 807 (emphasis added).]

Although this Court has not expressly applied Edwards, we reached a similar conclusion in the pre-Edwards (and pre-Chimel) case of Mark, 46 N.J. at 277-78.  There, the defendant sought to suppress the clothing he was wearing when he was arrested, which was seized at the jail after a trooper noticed a bloodstain on Mark's trousers.  Id. at 268, 277.  We declined to suppress the evidence, finding that "[t]he taking of the clothing and the examination of the trousers for bloodstains were clearly proper police procedures and were neither unreasonable nor violative of any of the

defendant's constitutional rights." Id. at 277.  The record did not reveal "the precise hour" when Mark's clothing had been taken, but this Court found no "legal significance" in the fact that the police did not remove his clothes immediately at the time of his arrest and instead waited until "after his delivery to the jail where facilities [we]re available."  Id. at 278.

The Appellate Division applied the reasoning of Edwards to uphold a non-contemporaneous search incident to arrest in State v. Malik, 221 N.J. Super. 114 (App. Div. 1987).  In that case, after the defendant was arrested pursuant to the Controlled Dangerous Substances Act, an officer compelled her to provide a urine sample at the police headquarters.  Id. at 116-17.  The Appellate Division held first that "there existed sufficient exigent circumstances warranting the police demand for a urine specimen" because "it was reasonable for the police officer to assume that the presence of drugs in urine gradually diminishes with the passage of time . . . .  The evidence is thus evanescent and may disappear unless prompt investigative action is taken."  Id. at 118-19.  Second, after reviewing the principles set forth in Edwards, the court held that "the request for and obtaining of defendant's urine at police headquarters was incidental to her lawful arrest" in part because "the seizure of the evidence was not unduly remote in time or place," although the court

28

did not specify the length of the delay between the arrest and the seizure. Id. at 120-21.

More recently, in Lentz, the Appellate Division applied the Edwards rationale, holding that a delayed search incident to a valid arrest will be constitutional so long as "the delay itself and the scope of the search are objectively reasonable." 463 N.J. Super. at 71-72, 76.

In Lentz, the Appellate Division considered an interlocutory appeal from the denial of a defendant's motion to suppress a warrantless swab of his hands for gunshot residue ("GSR") about three hours after his apprehension by police officers. Id. at 60, 77. Officers responded to a 9-1-1 call reporting "shots fired" and, while investigating the scene, arrested defendant on an outstanding "unrelated arrest warrant." Id. at 60-61. While the police were taking the defendant from the scene, a witness informed them that "defendant was the shooter." Id. at 61. After a discussion with a prosecutor, the police elected to swab the defendant' hands without waiting for a warrant because GSR evidence is "extremely fragile, can dissipate very easily," and can be washed or wiped away. Id. at 63-64. The swab revealed GSR. Id. at 60.

The trial court granted Lentz's motion to suppress because the State failed to show the search of the defendant's hands was "sufficiently contemporaneous and proximate to his arrest" to be a proper search incident to

29

arrest and because "police had ample opportunity to obtain a warrant before taking exemplars from defendant's hands." Id. at 65. The Appellate Division reversed, holding that "the search was constitutionally permissible under the search incident to arrest exception to the warrant requirement." Id. at 79.

In its analysis, the Appellate Division acknowledged in Lentz that "as with all searches, a search incident to arrest must be reasonable" and that reasonableness "'depends on [the totality] of the circumstances surrounding the search . . . and the nature of the search.'" Id. at 70 (quoting State v. O'Hagen, 189 N.J. 140, 149 (2007) (alteration and omission in original)).[11] The Appellate Division then reviewed Edwards and canvassed other case law, including opinions from three other state courts.[12] Id. at 70-75. Upon doing so, the appellate court correctly recognized that judges must "balance the intrusion of [the search] on an individual's privacy against promoting vital governmental interests." Id. at 76. Striking that balance, the Lentz court held

---

[11] See also Oyenusi, 387 N.J. Super. at 157 (applying the incident-to-arrest exception to a container that was seized from a defendant "substantially contemporaneous" with his arrest).

[12] See Jones v. State, 74 A.3d 802, 806, 812-14 (Md. Ct. Spec. App. 2013) (holding that a warrantless swab for GSR forty-five minutes after arrest was a reasonable search incident to arrest); Commonwealth v. Simonson, 148 A.3d 792, 800-01 (Pa. Super. Ct. 2016) (holding that a warrantless swab for GSR that took place an unknown time after a valid arrest was a reasonable search incident to arrest); People v. Allen, 875 N.E.2d 1221, 1223-28 (Ill. App. Ct. 2007) (same).

that delayed searches incident to arrest of the arrestee's person are

constitutionally permissible so long as (1) the delay itself and (2) the scope of

the search were "objectively reasonable."  Ibid.

Applying that two-part standard to the facts before it, the Appellate

Division concluded in Lentz that the

> defendant was subjected to a search when his hands
> were swabbed for GSR evidence following his lawful
> arrest.  Although the search did not occur at the same
> time or place as his arrest, under the totality of the
> circumstances, [1] the delay and proximate location
> were objectively reasonable, and [2] the search itself,
> which was minimally intrusive in nature and limited in
> purpose, was objectively reasonable in scope.
> Thus, . . . the search was constitutionally permissible
> under the search incident to arrest exception to the
> warrant requirement and the motion judge erred in
> ruling otherwise.
>
> [Id. at 78-79 (emphasis added).]

The Appellate Division added an important caveat:

> By tailoring our holding to warrantless searches for
> GSR evidence following a lawful arrest, we neither
> untether the search incident to arrest exception to the
> warrant requirement from its justification nor give
> police free reign to conduct warrantless searches
> without probable cause at any point after a lawful
> arrest.
>
> [Id. at 79.]

Subject to that important caveat, we concur that Lentz's two-part

standard of reasonableness for delayed searches incident to an arrest prescribes

31

a proper constitutional balance, and we endorse the sound principles set forth in that opinion. The <u>Lentz</u> standard protects, on the one hand, individual privacy rights while furthering, on the other hand, important governmental interests in public safety and the gathering of evidence for the prosecution of crimes. The approach satisfies the Fourth Amendment, consistent with <u>Edwards</u>, and comports with Article I, Paragraph 7 of our State Constitution.

## B.

Comparable with the GSR evidence at issue in <u>Lentz</u>, the present case involves biological evidence of a crime believed to be present on an arrestee's clothing or hands. The parties and amici do not dispute that biological evidence on a person's clothing or hands, such as traces of dried blood, can decay or dissipate through washing or contact.

Case law has recognized that risk of dissipation. For example, in <u>Cupp v. Murphy</u>, 412 U.S. 291, 292, 296 (1973), the United States Supreme Court noted the need "to preserve the highly evanescent evidence" -- the dried blood of a strangulation victim -- that a suspect appeared to be attempting to destroy. After noticing a dark spot on the detainee's finger that might have been evidence of dried blood, the police took a sample of scrapings from his fingernails. <u>Id.</u> at 292. The defendant "was sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what

32

evidence he could without attracting further attention."  Id. at 296.  "[A]fter he refused to consent to the taking of fingernail samples, he put his hands behind his back and appeared to rub them together.  He then put his hands in his pockets, and a 'metallic sound, such as keys or change rattling' was heard."  Ibid.

Cupp held that the rationale of the search-incident-to-arrest doctrine in these circumstances "justified the police in subjecting [the detainee] to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails."  Ibid. (citing Schmerber v. California, 384 U.S. 757 (1966)).  The Court's opinion elaborated, "considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments."  Ibid. (emphasis added).

Other courts have made comparable observations about the destructibility of biological evidence.  See. e.g., United States v. Bridges, 499 F.2d 179, 182, 184 (7th Cir. 1974) (finding a defendant's Fourth Amendment rights were not violated when police swabbed his hands without a warrant and found trace dynamite components because, "had the agents not swabbed [his] hands at the time, the opportunity may not have knocked again, especially if

33

[the defendant] washed his hands"); United States v. Smith, 470 F.2d 377, 379 (D.C. Cir. 1972) (rejecting a defendant's challenge to the admission of a benzidine test administered at the police station that allegedly indicated the presence of blood on his penis shortly after a sexual assault, finding the test was a reasonable search incident to arrest "since it was obviously necessary to conduct the test as promptly as possible because of the ease with which the evidence could be destroyed by a thorough washing"); People v. Johnson, 133 A.D.3d 1309, 1310-11 (N.Y. App. Div. 2015) (holding that a swab of a blood stain taken from defendant's torso was a permissible warrantless seizure "because [the evidence] could have been easily destroyed by defendant").

C.

Here, the police had a reasonable basis to think defendant had a motive to destroy incriminating biological evidence and was deliberately trying to pick blood or other biological material off his fingers and clothes. Even if he wasn't doing so intentionally, and he was instead only fidgeting as the defense submits, the fact remains that defendant's conduct could have been destroying critical evidence in a homicide case. It was surely reasonable for the police to take steps to preserve that evidence after defendant's statements furnished probable cause that he had killed Ernst.

Applying <u>Lentz</u> factor one, there are ample grounds to sustain the trial and appellate courts' findings that the delay in performing the search of defendant's body and clothes was reasonable. It wasn't until defendant was interviewed at the police station, after proper <u>Miranda</u> warnings, that the officers heard him admit to incriminating facts supplying them with probable cause to arrest him for murder. And it was not until that interview that the officers saw him repeatedly picking at his fingernails and rubbing his hands on his clothes. There was an ongoing risk that defendant could have dissipated the evidence, either in the interview room or during a washroom break. The officers had a legitimate concern that it might take considerable time to obtain an after-hours warrant. The delay was not unreasonable and indeed far shorter than the ten-hour delay upheld in <u>Edwards</u>.

Applying <u>Lentz</u> factor two, we are satisfied that the scope of the search, which involved the swabbing of defendant's hands and the removal of his sweatshirt, was reasonable. As reflected in the police report, the sweatshirt was specifically observed by Detective Marchak to possibly have biological material on it. Because that sweatshirt was the only seized item that the State would have sought to admit at trial, we need not address whether any other fruits of the search would have been within a reasonable scope. When the warrant was eventually procured later that evening, it gave the police the

35

express authority to take the next steps and have the sweatshirt tested at a forensic laboratory.

In sum, we affirm the well-reasoned decision of the Appellate Division rejecting defendant's challenges to the search and seizure of his sweatshirt, in the totality of circumstances presented.[13] The seizure of defendant's sweatshirt was justified under the incident-to-arrest exception to the warrant requirement and involved no unreasonable delay or excessive scope. There accordingly is no need for us to reach the State's alternative arguments of exigent circumstances or inevitable discovery.

V.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, and WAINER APTER join in JUDGE SABATINO's opinion. JUSTICE FASCIALE did not participate.

---

[13] In reaching our determination on the specific facts here, where biological evidence was visibly being dissipated, we do not encourage law enforcement officers to seize all of an arrestee's clothing unnecessarily or to bypass warrant procedures without sufficient justification.